and I think our inclination, unless Judge Mayer has a different view, is we'd like to hear from the government, Mr. Haveman, before Mr. O'Malley, rather than the other way around. So why don't we start with Mr. Lombardi. Thank you, Your Honor. May it please the Court. The District Court erred in its consideration of the on-sale bar in this case, and I'd like to start by addressing two issues. First, the ready-for-patenting issue, which I hope to address briefly, where the District Court failed to consider one of the alternative means of establishing ready-for-patenting. And then the AIA issue, where the District Court erroneously eliminated decades' worth of law related to the on-sale bar by giving meaning to a clause that was put at the end of the section that contained the relevant language. On your first point, if we agreed with you that there is another prong of path that the Court just didn't consider, because there are underlying factual issues, shouldn't we have to remand for that determination? You certainly could, Your Honor, but I don't believe that that's necessary in this case for this reason. The facts that underlie the findings related to ready-for-patenting are admitted by the other side, are clear. It's just a matter of applying the law to those facts, and our position is that the application of the law to those facts is clear under the facts of this case, where the ready-for-patenting finding demanded by the District Judge was well beyond anything that this Court has ever required for an enablement showing. In this case, where my opponent's own clients admitted from the witness stand that there was efficacy shown at the time of the Phase 2 testing and at the time of the Phase 3 testing, and they actually had results in the Phase 3 testing that showed that this drug worked for its intended purpose, that is sufficient by a long shot to get over any standard of enablement that's been established in this Court. So because those facts are admitted, Your Honor, yes, this Court can make a decision based on the record that's before it. So there's sort of a ripening theory here that the offer for sale took place in April, but that the facts that are necessary to determine enablement or reduction to practice took place later, and I guess both sides agree that treating the offer to sell as ripening into a bar can take account of later events that happen after the actual contract, right? Yes, both parties agree on that, Your Honor, and the fact is that in this case there are events that we say satisfy the ready-for-patenting showing that were before the actual sale took place. But we do argue all of the actions, including actions after the sale actually took place, do count, and that is not disputed by the parties in this case. So the lead argument that my opponents make on this issue is waiver, Your Honor, and there simply was no waiver. In the closing argument at A26462, which is page 37 of the closing argument, the point was made to the Court that there were two alternative ways to prove ready-for-patenting. The Court actually asked confirming questions. The Court's questions were confirmed, and then the assertion was made that that had been shown. We do not have a closing brief to cite for you, Your Honor, because the district court didn't permit briefing at the end of the case. So the closing argument was the last opportunity to address the issue, and it was clearly addressed there as it was in the pretrial briefs, as it was in the testimony of our experts, and so there is no possibility of waiver in this case. And for that reason alone, the ready-for-patenting alternative was wrongly decided by the district court. Could we turn to the question of whether this was a public offer for sale? I mean, there were various amicus briefs. The government acts as though this was a secret sale, but it really wasn't, in fact, a secret sale. There were press releases that were issued when this contract was entered into, and they described the active ingredient. They described what it was designed to do. The only thing that was missing, I guess, in the public releases was the dosage formulation of 0.25, right? Yeah, that's exactly right, Your Honor, and Your Honor points to exactly what's in the record. There were press releases that announced this sale. The only thing that wasn't described publicly was the details of the formulation. Were the details of the formulation disclosed in the Phase III trials? They were disclosed, obviously, to the people who were conducting the Phase III trials, Your Honor, if that's your question.  Your Honor, I don't believe that there is anything in the record on whether the patients were familiar with the – were provided the information about the formulation. Were the people who were administering the trials subject to an obligation of secrecy? Yes, they were, Your Honor, so there was no disclosure in that sense during the trials, but the point about the public nature of the disclosures in this case is that this court and medicines company went through a careful analysis of what's important about the on-sale bar, and what's important is that commercial marketing not start – that the activity of commercial marketing not start in advance of filing for a patent. That was made very clear through the review of the precedent in this case, and through what the medicines company case actually decided. But that was a pre-AIA case, so if, in fact, there is some public component to this, the question is what was publicly disclosed, and the critical piece of the public component has to be the formulation, right? Well, the critical – that is the invention of this case, there's no question. But what I'm speaking to, Your Honor, is the statement in the medicines company opinion that confidentiality is a point to be considered, and if it's a point to be considered, then the ranges of confidentiality are relevant as well. And here, there's no argument, I concede, that the actual formulation was not disclosed, but as Judge Dyke points out, there was publicity surrounding this formulation, this testing that was being done, this contract that was out there. And the significance of that, Your Honor, is they are trying to benefit commercially by having a press release, by announcing the fact that they have this agreement in place with MGI to sell the product. They have that out there. Now, in the overall scheme of things, what does that tell us? That tells us that the confidentiality here of the formulation itself is of limited help to my opponents. So, Your Honor, let me with that turn to the AIA and what the AIA does to the on-sale bar. The real issue here is, does the otherwise available to the public clause change the meaning of on-sale that has been established in this court over decades, literally decades? Or, is the district court correct that the addition of the otherwise available clause at the end of 102A changes the law of on-sale bar? And our position is, clearly, it does not. I'm having difficulty in seeing why either the last antecedent or serious qualifier canon has anything to do with this. Because once you take away available to the public, you're not left with a category. It just would be the word otherwise. Well, we would say that it's otherwise available is what is being modified by to the public. So it would be the four categories of prior art or otherwise available. But transposing to the public to the other categories in and of itself doesn't make sense. You'd have to say available to the public is the phrase that you bring and apply to the others. Well, I would submit, Your Honor, that the proper reading of this is the reading that we get from the Barnhart case, the Supreme Court case in Barnhart. And that's the case where the Supreme Court... Wait, wait, wait. I don't think you've really addressed my point. Why isn't available to the public the phrase that we're dealing with that people are saying ought to apply to the earlier items in the series? Well, it has to be available to the public. It can't just be to the public, right? Well, if it's available to the public, you have the same problem that you would have otherwise, Your Honor. And that is that available to the public... Well, the trouble you have is that you're left with the word otherwise, which doesn't mean anything as an item in the series. But what you're left with as a matter of statutory construction, Your Honor, is you're left with a clause at the end of the section, the otherwise available clause, that doesn't apply equally to all the categories of prior art that come first, come before it. And by that, I mean otherwise available to the public seeks to add a public component. If you were to apply that... I understand all that, but I don't think you're understanding my point, that if you slice that off, the last category is otherwise, which doesn't make any sense. So it seems to me that neither the series qualifier canon nor the last antecedent canon can apply here because you're left by slicing off this thing with a word that isn't a category. Well, if that were true, Your Honor, if that is true, what you have still is a category of art that is separate and distinct from the art that's set forth in the four categories that existed prior to the AIA and are adopted into the AIA by using the exact same language. It's a separate category that addresses other events, other items that are public. What might be an example or two of those? That would fall into that category, Your Honor? So, for instance, back when this was first drafted, this section was first drafted, the predecessor section in the 50s, we didn't have social media. We didn't have computers. We didn't have tweets, and we didn't have videotapes. All of those things are now potentially within the publicly available clause because it just reaches anything that is otherwise publicly available. That is what a fair reading of the statute is, is that all of the categories of prior art that are set forth in new 102A, in AIA 102A, are categories that existed previously and were defined by this court and others over the decades. Then you get to the last category, and it clearly is intended to expand prior art. It's intended to meet new prior art and look into the future about things that we can't foresee right now and say that if those things amount to something being publicly available, that's going to be prior art as well. You don't have to have a use. You don't have to have a sale. You could have something available to the public even in the absence of those activities. You could have something in the absence of those activities. Those activities, like an oral description at a conference or something like that, I would assume something like that would fall within publicly available, Your Honor. What you have is the four categories that always existed, and no change was made in the wording related to those four categories. It would have been an easy matter for the Congress to put the word public or some form thereof around the words on sale if it had intended to chain the decades of precedent that existed with respect to on sale. But it did not do that, and Congress is presumed to be aware of and to accept the existing well-established definitions of the law that are in existence at the time that the statute is passed. They could have done it, and they didn't do it, and they did make changes. Relevant to this prior art, for instance, they eliminated the geographical restriction. They took out the geographical restriction when they wanted to make a change in that. They made no such change with respect to on sale. It's an odd way, to say the least, to go about making a drastic change in the law by retaining the exact language that exists previously, not only for on sale, but for the other three categories of prior art. Do we even need to reach this question if we conclude that it wasn't a sale otherwise? I need to win on the sale question, and I need to win on this question. So if I lose on the sale, I lose, Your Honor. I won on the sale on three of the patents below, but it's the post-AIA patent that I lost on the sale. So yes, in response to Your Honor's question. Why don't you address the question of whether this was an offer to sell? There's been an argument that because the contract was subject to FDA approval, and because there were two different formulations, the .25 and the .75, that this was not an offer to sell. Yes, Your Honor. I think this is clearly an offer to sell, and very different from the contract that was considered in the medicines company. I'll start with the recognition in the medicines company case that while the UCC is not of talismanic significance, it is of significance. And the UCC makes very clear that future or contingent contracts are still contracts for sale. Can you cite me to any UCC case where the contingency was determining what the product would be, as opposed to something like shareholder approval or some other outside aspect? In other words, you still had the product defined, you still had the price defined, and your contingency was something totally different. I've seen a lot of those cases. But have you ever seen a case where the contingency was, what is the product we're even going to sell? All I have to cite for you, Your Honor, is the UCC itself, where it says that contingent contracts are still contracts for the sale of goods. And I don't think it makes a difference whether it's a contingency for what the actual product was, or a contingency for something else. Because in this case, there were only two alternatives, two possibilities, and they were specifically laid out there. There's also the possibility there never would be a product. I mean, people have busted phase three trials before, right? That's possible with any contract for future goods. It's possible that it will never happen. The point is that the contract was entered into. And in entering into the contract, what Helsin did was start the commercial marketing process. And they started the commercial marketing process by lining up exactly how they're going to profit from their sale of the product. And once they start the commercial marketing process, that's when the on-sale implications begin. Well, but you say once they start the commercial marketing process. In medicines, we said that commercial benefit in and of itself is not enough. Really, you have to have a sale or an offer for sale. Yes, that's true. And I think the context in which you said commercial benefit is not enough is in distinguishing the situation where there's a manufacturing agreement. And a manufacturing agreement can be said to offer commercial benefit because you're stockpiling or doing whatever to get ready to market the product. But with a distribution agreement, and this distribution agreement in particular, we're talking about the way in which Helsin profited from this drug. It sold to the distributor, MGI. And when it sold to the distributor, it gave up title. What did it sell to the distributor? If all you had was the licensing agreement, which is the only place that the money comes in, you wouldn't argue that was a sale, would you? No, but we have a separate contract called specifically... But the money was in exchange for the licensing agreement. At that juncture? No, not at that juncture, I don't believe, Your Honor. The record is pretty clear. I mean, there's both testimony and in the agreement itself that the money exchanged hands in connection with the licensing agreement, not with the distribution agreement. But it is one agreement. They couldn't distribute without having the license, Your Honor. And so it's called a purchase and sale agreement. It's specifically laid out as a purchase and a sale. And as long as there's a... Well, a contemplated future purchase and sale, right? Yes. And for that agreement, there was no exchange of money. They contemplated the exchange of money in the future. Yes, Your Honor. That's correct. It was going to be a future exchange of money. Purchase orders, acceptance of those purchase orders, and then ultimately an exchange of money. So I'm not saying I necessarily disagree with you with respect to the purchase and sale agreement, but I think we need to differentiate between where the money actually changed hands and where it didn't, or where it was only contemplated. Well, and I don't disagree, Your Honor, that the purchase and sale agreement is an agreement that's going to happen in the future. It is an agreement for the future sale. And so that is true. But under the precedent in this case, in this court and under the UCC, future sales are still sales. Could you help me by telling me what the status of the FDA approval process was in April at the time the agreement was signed, and then also what the status of the FDA approval process was at the critical date, which I forget, I think it was January 30th or something like that. FDA approval had not occurred by the critical date. What had happened was... Let's take April first. What was the situation? And, Your Honor, I'm going to have to check to make sure I have this precisely. But I believe what the evidence was was that Phase II testing had been completed, that the protocol for Phase III testing was being approved. And I believe the Phase III testing actually started in August. And then the initial test results were revealed in January of 2002 before the critical date. What is the approval rate of products by the FDA once they go through a successful Phase III trial? Your Honor, that's not information that's of record in this case. But the Phase III trials and FDA approval really isn't the relevant consideration for purposes of ready for patenting. This Court has made clear... No, I understand that. I think the question is coming back to what Judge O'Malley was raising as to whether this affects the question of whether there was an offer for sale given the contingent nature of this, that it was subject to FDA approval. Well, it's... Our position has always been, Your Honor... Did people understand that FDA approval was likely to be forthcoming? Absolutely, Your Honor. Because what happened was they had gotten approval to go forward with Phase III testing. To get to Phase III testing, they had to do testing. And they did testing on humans which showed a reduction of emesis in people who were administered the drug. They told the FDA that that was a clear demonstration of efficacy. And so when it went into Phase III, the expectation was clearly that it would work. And when it came out of Phase III, before the critical date, there was confirmation of that fact as well. What if you didn't even have that? What if you hadn't even gotten through Phase II and you had an agreement like this, looking forward? In other words, you're putting in place the possibility that you're actually going to have a marketing stream. You're not selling anything yet. There's no public user, no end user yet. But... And you have no idea whether or not you're actually going to get past the FDA. Would that change the analysis? I don't think so, Your Honor, because under this court's precedent on enablement, ready for patenting... I'm talking about the sale. I understand, but I think the two come together because we're talking about ready for patenting and a sale. And when did the two come together? And my point, Your Honor, on this is that this court has never required that there be actual testing of a pharmaceutical in order to have enablement. And I refer to the Lilly case where the court cited the MPEP for the proposition that you can even not have any clinical data, but just have a protocol for clinical data. And that's sufficient to conclude that enablement has been satisfied. So using that standard, going back to April or whenever, at the time that the Phase II testing was done and the Phase III... The Phase II was the basis for the Phase III here, obviously. Going back to the time the Phase II testing was done, they were ready for patenting. And so the sale is... You're saying once it's ready for patenting that any promise for a future distribution stream becomes an invalidating sale? Yes. And I don't think it has to be before, that the ready for patenting has to be before the sale. It can be after, but certainly if it's before the sale, it can be as well. Okay. Thank you, Mr. Lombardi. We'll give you four minutes for a rebuttal there. Mr. Haven. May it please the Court, Will Havenon on behalf of the United States. The government has participated in this case to address one issue, that is whether a transaction could make an invention available to the public to trigger the on-sale bar as Congress revised it in the AIA. So you rely on all this legislative history, but aside from I think one statement by Senator Kyle, it's all kind of ambiguous as to what they're talking about in terms of a public sale. In other words, here we have a sale which was public. The only thing that wasn't known was the exact formulation. And it's not at all clear what kind of distinction was something that was apparent to the senators and representatives who were speaking about this, right? Well, I think that it's clear from the language that Congress actually enacted, which is that it requires that a sale Stick with me on the legislative history. Do you agree that the legislative history doesn't make, with the exception of one of the Kyle statements, doesn't make clear whether it's dealing with a situation in which the sale is public or whether it's dealing with a situation in which the sale and all the characteristics of the invention are made public? I don't think that I do agree, Your Honor. So the language that became the residual clause was introduced in the Senate Judiciary Committee in 2007. And that committee report said that the residual clause would emphasize the fact that prior art must be publicly available. So the question is whether the invention is publicly available. Now, the Senate passed that bill in 2011 and Senator Kyle and Senators Hatch and Leahy made comments on the floor suggesting that that was their understanding of the residual clause as well. Now, the House then, three weeks later, three weeks after the Senate passed that bill, the House introduced a new bill that adopted the residual clause verbatim. And if there were any doubt, the House meant to adopt the meaning that the Senate had imposed on that residual clause. That's eliminated in the committee report of the House, which again says it uses the same language that it emphasizes the fact that prior art must be publicly available and it cites to the statements that Senators Hatch, Leahy, and Kyle made on the floor. So I think that although we don't need to rely on the legislative history here, I think the legislative history is absolutely clear that this is what Congress intended when it passed the residual clause. So in your view, if there were a sale, let's say to 20 people, which was confidential, didn't tell or offer to sell to 20 people, which was confidential, didn't tell them what the formulation was, that that could still not be an on-sale bar? So I think it would depend on the facts of the case. Okay, what does that mean? Well, with 20 people, that would certainly be relevant to the on-sale questions, the question whether this was a sale that made the invention available to the public. I just reemphasize that I don't at least believe that that's in dispute in this case. That is, I don't believe that Teva was a sale that made the invention available to the public. Well, take my hypothetical. There are 20 people whom they offer to sell it to. Let's start with an offer first. And this is all on condition that the sale be kept confidential. Does that qualify for the on-sale bar or not? So I think it well might. It well might. And the question that the Court would be faced with  an interested member of the public would be able to learn about the invention and how it was sold. That's part of my problem. The question here is not for you, it's not so much what they're arguing, but the workability of your proposal. So what if the member of the public to which it was sold and to which it was sold confidentially was somebody who wanted to use it in connection with their chemotherapy treatments? And they did. Now, is that an interested member of the public? But it's a confidential sale. We believe, I'll do my best to answer Your Honor's question. We believe that the existence of a confidentiality agreement is certainly relevant to the question of whether or not it makes the invention available to the public, but it's not dispositive. And I can imagine cases where the offer... That's not really what you argued in your briefs. I mean, you argued in your briefs that secrecy, secret sales simply should be excluded. Well, sure, Your Honor. And I apologize if our briefing on that point was imprecise. We use the term secret sale, I think, in the way that this Court had used it in the past, which is to refer to a sale that does not make the invention available to the public. And I just, to step back, this is an inquiry that this Court already applies. It already applies it with respect to the categories of prior art of printed publications and many public uses. So the Court is well accustomed, and the lower courts are well accustomed to determining whether or not an invention is made accessible or available to the relevant public. Okay, so who is the public? The public writ large or what? I really don't understand who the public is in your formulation. So the question, as this Court has applied it, is whether or not an interested member of the public, so someone interested in the invention, could learn about it as a result of the transaction. So what one non-confidential sale makes it publicly available? It could well, and we point, Your Honor, to the decision in FATH. Could well depending on what? So I think it depends on a number of factors. I think that it depends on if there's confidentiality agreement, that is relevant. If there are any conditions on resale, that may be relevant. If the offer was extended, even if it was confidential, if it was extended to many potential buyers, that may be relevant. And so I point, Your Honor, to the Supreme Court's decision in FATH to underscore the, I think, modesty of our argument here. FATH was a single transaction between an inventor of a computer chip socket and Texas Instruments. And there it was a single sale and there were no conditions on resale. The inventor or the buyer was not under any obligation of secrecy. The Supreme Court determines that that was a sale. So why isn't the answer to my question that a single sale would be sufficient? Under existing law anyway. I certainly don't want to resist Your Honor's hypothetical. I think that it is a fact-intensive inquiry. I can imagine. It leaves us with a completely unworkable standard. People are trying to make important decisions about when to print a publication, when to enter into these agreements, are asked to consider a multiplicity of factors. I mean, if I were a lawyer advising them, I would say, I don't know what to tell you. It's a multiplicity of factors and you really can't tell whether it's a sale or not until you get into litigation and the court gives the final word on it. Well, I do want to reassure the court that this is a standard that the court already applies and the invention is in public use. The court is accustomed to determining whether or not this is an invention that is accessible or available to the public. And I don't think that the rule that we're suggesting here is any less workable than those rules have proven. But under existing law, under PAF, as you yourself pointed out, a single sale, at least if it's not confidential, qualifies for the on-sale bar. Right. So it sounds like that would be an invalidating sale. So are you contending that the sale has to be to an end-user as it was in PAF? It does not need to be to an end-user. We can imagine a sale to a wholesaler or retailer that might make the invention available to the public if the wholesaler or retailer was under no obligation of secrecy, if there were no conditions on resale. We think that that sounds at least reasonable to the public in that an interested member of the public could learn about the invention by virtue of the sale. So do you think the sale in this case was an invalidating sale? So we do not believe that the sale in this case was an invalidating sale. The formulation was not disclosed? That's right. The formulation was not disclosed. And the buyer was under a condition of secrecy or confidentiality such that even though there were press releases and touting this substance as a solution to the vomiting problem and chemotherapy, all that, unless the exact formulation was disclosed, it doesn't qualify. So based on my understanding of the record, this was not an invalidating sale. And although it is true that there were press releases, those press releases did not make the invention available to the public. They may have announced the fact of a sale, but that did not announce the existence or the fact of an invention to the public. And that is the relevant inquiry under the AIA. But we do not want to, if this Court concludes otherwise, if this Court concludes that this was in fact a sale that made the invention available to the public, that will not cause us any heartburn. Our primary concern in this case is to make sure that the Court recognizes that under the AIA there is a requirement that a sale make, or offer for sale, make the invention available to the public. Okay. Thank you, Mr. Hayden. Thank you. Okay. Mr. O'Malley. Thank you. May it please the Court. I really want to address the ready for patenting argument and the MGI contract. My opponent now is relying on the enabling description prong of that and his theory is that the district court He's relying on both. He's relying on both ready for patenting. Well, I would argue that's correct. He seems to be conflating the two and introducing the human clinical data and arguing whether efficacy was shown. But I mean that the phase three trial results were available to the extent that it was known that 81% of the people benefited from this, right? Yes. And let me address that data but let me lead up to it with what the health knew prior to that. And again, the background is we have a Let me just ask you one question so we can make sure we're all on the same page. You agree with the ripening theory. In other words, the contract existed in April but you have to consider the events that happened after the contract up to the point of the bar date, right? Your Honor, that's FAB footnote 14. And they say, you know, an offer for sale may not be an offer for sale if there's further development work that had to be done after that alleged offer for sale and Space Systems cites FAB for that footnote for that exact proposition. That's a little different point. I just want to make sure that we're not differing about the fact that when you have a let's assume that there is an offer for sale here in April but at that time it's not ready for patenting that the fact that it becomes ready for patenting makes the offer for sale ripen into a bar at the time that it is ready for patenting if that happens later. I think it can under the facts of this case. I understand. You don't agree with the hypothetical but the fact that at the time of the contract that it wasn't ready for patenting is irrelevant as long as it becomes ready for patenting before the bar date. I bicker with irrelevant. I think it can be the case. I think again it's a factual analysis and here the critical... I'm sorry. I don't understand that. Why is it I understand it's a factual issue as to whether something is ready for patenting. I understand it's a factual issue as to whether the contract was an offer. I'm asking you to assume that the contract was an offer and that after the offer there was an eventuality that was ready for patenting before the bar date. Yes. That's sufficient to create a bar, right? Correct. Okay. Now, why is that not the case here? Well, we submitted it because how the contract was structured. The definition of product is registered product which means approved by the FDA or the Canadian equivalent. In this case they said well, our currently registered products for review are the .25 or the .75. Now, what could have been a registered product, no registered product existed in April 2001. It could have been either of those. It could have been neither of those. The license agreement clearly sets forth the probability that no product gets registered and both parties accept that fact and walk away or it could have been some other product that they took after a failure in phase three and then became registered. Are you suggesting that the contract that was entered into here wasn't binding under the UCC? I have no opinion on the UCC application. I'm merely talking about the certainly future contracts can be binding under these facts. I look at it like was the .75 milligram product the subject of an offer for sale? You don't have a view on whether the agreement was binding? Surely you must think it was binding, right? It was binding but at the time it was entered into there was no entity that met the definition of product. .75 which was listed as a currently registered product or future registered product never was approved. So was it the subject of an offer for sale? It never met the definition of product and we submit that the .25 only met the definition of product once it became FDA approved. I want to go back to your question. I don't think I addressed it fully about the phase 3 data. I want to briefly sort of go back and look at the history leading up to that. We had the phase 2 trial, study 2203. The result of that was a signal of efficacy generally. Remember there were five doses tested. With respect to the .25 milligram dose there was no statistical significance showing that there was actual efficacy for that dose and the standard applied was not FDA standards as my opponent says. As the court pointed out and the court points this out in at A148 the standards Dr. Peck applied our expert for former head of CEDAR were scientific standards that he thinks opposed as defined by plaintiffs would embrace. The court found the lack of efficacy for .25 milligram in 2330 and this is at A154-5 was a scientifically valid observation opposed would make when viewing that documentation. When there is an end of phase 2 meeting with the FDA subsequent to that the FDA says quote and this is at A109-10 it's quote questionable whether the appropriate dose has been identified. With that as background they decide what are we going to do for phase 3. They decide they have to take three doses .25 and 2.0. The lower doses were known to be more stable but they were worried about the efficacy of the .25. They thought they had to bring higher doses into phase 3. The district court said this was more cumbersome and expensive endeavor taking two doses  phase 3. If they had confidence about .25 they would have to bring higher doses into phase 3. The court found it was a factual matter and our opinion that it had to be efficacy according to what POSA would accept as scientifically valid analysis including well-developed and complete statistical analysis of the data. That is what brings me to the preliminary phase 3 data they had in early January. As the court observed preliminary means preliminary. At A157 she found as a factual matter in view of the changes in methodology that were entirely possible as both science experts agreed POSA would not have been surprised to see those values change. They could change to not that study from a showing of efficacy out of a showing of efficacy. That was the standard both experts applied. In talking about the enabling description standard, my opponent talked about how it was mentioned in closing. In that section of closing he refers to Dr. Fruhoff's testimony. When Dr. Fruhoff discusses the preliminary data, he is talking on the same page as Dr. Peck. Specifically he is talking about the statistical analysis of that data. And what was that statistical analysis? He talked about the package they used. He used it in graduate school. Trying to paint the story that this was statistically significant finding. But the court found and at other places Dr. Fruhoff agreed that the analysis could change. That number could change. That is an isolated statement from our health and phase 3 protocol but elsewhere as the district court found there were much less certain statements. It was a mere hypothesis that there would be efficacy found in phase 3. She took the protocol as a whole and found it did not show it was known to work for its intended purpose. Remember there is all this doubt. Dr. Calderari testifies about all the debates about what doses to take further into phase 3 and of course the FDA saying we don't think you have found the right dose yet. That is why they had to do this cumbersome trial where they took two doses to all these different centers to try both doses in each of the patients. Was the .75 also covered by claims of these patents? Not covered by any claims we have asserted. I don't know the answer. You don't know the answer to the question of whether .75 is covered by other claims of the patent? I am told some of the broader claims covered nonasserted claims. I want to turn to the MGI agreement. You asked. What was the status of the FDA approval as of the bar date here? As of the bar date, there was this preliminary data that existed. It was another six months until the final report on study 9903 came out. At that point in time, as the court noted, it occupied 17 volumes in the NDA with dependencies. That was in July of 2002, the date  January of 2002. Approval follows in September of 2002. Of course, there was a second phase three trial that was also being analyzed and that was behind 9903 in the timeline. Turning to the MGI agreement, again, it's confidential. It's not confidential. You issued press releases about it. The only thing that's not confidential is the exact dosage, right? The press releases just announced that this contract exists. It identifies the active ingredient. It identifies what the purpose of the active ingredient is. But it does not make, as the AIA says, the claimed invention available to the public. Our claimed invention is a very specific formulation at a specific dose that reduces the likelihood of emesis or CINB. And with respect to likelihood of emesis or CINB, there's some showing of efficacy in phase 2, but clearly there was. The much higher dose, 2 milligrams, showed statistical significance versus control in that phase 2 study. With respect to phase 3, even after receipt of the preliminary data, if you want to look at press releases, Helson released a press release on January 16th of 2002 and says we're analyzing the results of phase 3 and we're hopeful, quote hopeful, that efficacy will be found. Now, with respect to MGI, I think you're correct, Judge O'Malley, that under Enright Kohler, the fact that they received monies in connection with the separate license agreement does not make that constitute an offer for sale. We think under Medco, this is analogous to what happened. You don't have to receive money to have an offer for sale, right? That's correct. To the extent my opponent uses the license royalty and milestone payments, I just want to set them aside before I talk about the rest of the agreement. So with respect to the other part of the agreement, the purchase agreement, we think under Medco, these are mere preparations for commercial sales. They're confidential, which under Medco is not a talisman, but is indicative of it not being a commercial offer for sale, but more to the point of the policy of Medco. So my client Helson at that time had never sold a product in the United States. They had no marketing and distribution capabilities in the United States.  that regard, they're analogous to Medco, who just doesn't have the resources to do contract manuals. There's no question that there was a problem there. However, under Medco, there seems to be no principle reason to apply an on-sale bar rule differently to Helson than to, say, a Pfizer who has in-house marketing and distribution capabilities. And similar or analogous to contract manufacturing agreement at Medco, I don't think we should apply a different set of on-sale rules to this smaller client. I've got 23 seconds if the panel has any questions. Okay.  much. Mr. Lombardi, you've got four minutes here. Thank you, Your Honor. On the ready for patenting point, the answer to your question, Your Honor, is yes, there just has to be some showing of efficacy, not a showing that FDA standards are met. 81% of the people in this room who have been done and completed prior to the critical date here were shown to have successfully received this drug. That is beyond sufficient for the enablement standard that we have in this case. With respect to the government's argument about the legislative history, I would just point out that in 2007, the bill that was passed   Court, the legislative history went back into the bill. If you look at the drafting history of this section, on sale gets added because Representative Lofgren said you're eliminating some important areas of prior art. Then on sale went back in. The legislative history went back into the bill and failed. They strategically manipulated the legislative history to do that. Exxon, I submit, is applicable here and the legislative history is not of much use to this court in resolving the dispute. The MGI sale, this was far beyond a manufacturing agreement in medicines company. The medicines company was paying to have it manufactured. They weren't profiting from that. They were getting ready to profit. That was a preparation for sale. This distribution agreement was about selling the product and making a profit. Only because it was a sale that had not happened in the future. How is setting up a distribution channel different than getting your distribution channels ready if you have in-house distribution functions? Presumably, in the example of Pfizer, the in-house distribution network is not something that makes money by transferring the product to that in-house distribution center. What is different about this case is that Helson sold to a third party. He sold it and started the process of commercial marketing and making a profit off of its product. There was nothing that the third party could transfer to an end user, correct? Not to an end user, but that is not the inquiry. The inquiry is whether there was a sale or an officer for sale. This was clearly a sales contract that was entered into, it was binding, and it was for the future transfer of the product. That is sufficient under the UCC and under the precedent of this case. Your Honor, as I close here, I would come back to the important policies that underlie the on-sale bar as developed in this court and other courts over the years. As articulated in the medicines company, it is to prevent somebody from commercially marketing before the patenting process begins. Here, it is a perfect example of a situation where Helson started this commercial marketing product before it filed this patent application. It is a case that exemplifies what the on-sale bar is about and exemplifies the policies behind the on-sale bar. Thank you very much. Thank you, Mr. Lombardi. I thank all counsel. The case is submitted and that concludes our session for this morning. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock. �